# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THOMPSON BENALLY and ELLIOTT J. CLARK,

       Plaintiffs,

vs.

ROSENFELT & BUFFINGTON, P.A. d/b/a THE                      No. 06-CV-0592 JCH/RHS
INJURY LAW CENTER, DANIEL M.
ROSENFELT, and FORREST G. BUFFINGTON,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment to Declare that Navajo Nation Courts did not have Jurisdiction to Adjudicate Plaintiffs' Underinsured Motorist Claims, filed February 7, 2007 [Doc. 34], and Defendants' Motion for Summary Judgment to Declare that Forrest Buffington is not Personally Liable for the Actions that Allegedly Injured Plaintiffs in the Underlying Suit, filed February 28, 2007 [Doc. 39]. The Court having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that Defendants' Motion for Summary Judgment to Declare that Navajo Nation Courts did not have Jurisdiction to Adjudicate Plaintiffs' Underinsured Motorist Claims is well taken and will be granted, and that Defendants' Motion for Summary Judgment to Declare that Forrest Buffington is not Personally Liable for the Actions that Allegedly Injured Plaintiffs in the Underlying Suit is not well taken and will be denied.

**BACKGROUND**[1]

I.  <u>Facts Relevant to the Motion for Summary Judgment on Jurisdictional Grounds</u>.

On January 28, 2005, Lorita Benally, Sylvanna Clark, Sylvania Clark, and Tom Grandson were killed in a motor vehicle accident on U.S. Highway 160, a public highway near Red Mesa, Arizona, which is within the boundaries of the Navajo Nation.

Tom Grandson and Lorita Benally entered into a contract of insurance with GEICO on January 14, 2005, to insure their 2004 Dodge Stratus. As part of that insurance contract, GEICO agreed to provide underinsured motorist coverage for Lorita Benally, Tom Grandson, and their passengers. The insurance contract identifies itself as a Utah policy.

The GEICO policy indicates that it was issued by GEICO in either San Diego, CA, or Washington, DC. The GEICO contract indicates that it was delivered to Tom Grandson and/or Lorita Benally in Provo, Utah. The GEICO policy states that the insured vehicle would be regularly garaged in Provo, Utah.

Lorita Benally had also entered into a contract with American Family Insurance Company to insure another vehicle. Lorita Benally's insurance contract with American Family was effective at the time of the accident. As part of that insurance contract, American Family agreed to provide underinsured motorist coverage. The American Family insurance policy identifies itself as a Utah policy.

The American Family policy indicates that it was issued by American Family either by its agent in Orem, Utah, or from Madison, Wisconsin. The American Family contract indicates that it was delivered to Lorita Benally either at its agent's office in Orem, Utah, or to Lorita Benally's home address in Provo, Utah. The American Family policy was issued and priced on

---

[1] The following facts are either undisputed or construed in Plaintiffs' favor.

the condition that the statements made by Lorita Benally in her insurance application were true.

Geico Indemnity Company is not incorporated in the Navajo Nation.  American Family is not incorporated in the Navajo Nation.[2]

II.     Facts Relevant to the Motion for Summary Judgment on Personal Liability.

On March 7, 2005, Defendant Forrest Buffington met with Plaintiff Thompson Benally, Plaintiff Elliott Clark, and some of Plaintiffs' family members to discuss potential wrongful death claims arising out of the deaths of Lorita Benally, Sylvania Clark, Sylvanna Clark, and Tom Grandson.  At that meeting, Defendant Buffington obtained information regarding the identity of the decedents' family members and relationships among them.  He also explained that there were many uncertainties that had to be addressed regarding the wrongful death claims. Plaintiff Thompson Benally agreed to obtain the services of Defendant Rosenfelt & Buffington, P.A., to represent him individually and as personal representative for his sister and her two daughters who had been killed, and as representative of his nephew, Plaintiff Elliott Clark.

On March 11, 2005, Defendant Buffington presented Plaintiffs' request for representation at a shareholders' meeting of Rosenfelt & Buffington, P.A.'s predecessor in interest, Rosenfelt, Buffington & Borg, P.A., and the shareholders agreed to accept the case.  The shareholders agreed that Defendant Rosenfelt would handle the representation on behalf of the firm.  As of

---

[2] Plaintiffs originally objected to the documents supporting these facts, because they were not supported by the pleadings, depositions, answers to interrogatories and admissions on file, or by affidavit, which, Plaintiffs argued, prevented them from being able to test the authenticity and veracity of the documents or to explore their relevancy.  Defendants, however, obtained a certified copy of the GEICO policy, and placed that document into evidence on summary judgment, and further indicated that Plaintiffs have stipulated for the purposes of the jurisdictional summary judgment motion that the uncertified American Family insurance policy is accurate.  Furthermore, Defendants attached in reply an affidavit of Eunice Begay of the Navajo Nation regarding additional facts.  It therefore appears that Defendants have cured the authenticity issues surrounding the evidence and/or that Plaintiffs are waiving their initial objections to the evidence.

March 11, 2005, Rosenfelt, Buffington & Borg, P.A., was a professional corporation with three shareholder/directors: Daniel Rosenfelt, Forrest Buffington, and Scott Borg.

On March 11, 2005, Defendant Rosenfelt wrote to Plaintiff Benally, with a carbon copy to Plaintiff Clark, and informed Benally that the firm had accepted the case. Defendant Rosenfelt informed Plaintiff Benally that he would have principal responsibility for the matter and would call Defendant Buffington for assistance as needed.

On April 12, 2005, Defendant Buffington met with Plaintiffs and some of their family members outside of the firm's Shiprock office. This was the last time Plaintiff Benally met with Defendant Buffington. At the meeting, Defendant Buffington gathered more information about the decedents and their relationships with family members, and again discussed the uncertainties of the outcome of the wrongful death case. Defendant Buffington told the individuals present about potential conflicts with other family members, and asked them to waive those conflicts. Defendant Buffington said that he could not represent everybody without those waivers.

At the meeting, Defendant Buffington told Plaintiff Benally and his family that they "would probably have a big family meeting in Chinle or somewhere else to agree on how to divide up the money with other family members." That meeting never took place. Defendant Buffington also told Plaintiff Benally that he would get Benally appointed as personal representative for the wrongful death claims of his sister and her two daughters. Buffington did not do so.

A factual dispute exists with respect to what Defendant Buffington told Plaintiffs and their family members during one or both of the meetings regarding application of the Navajo Nation law. Certain evidence indicates that Defendant Buffington represented that Navajo law would be applied while other evidence indicates that he stated that Navajo law might be applied.

4

Defendant Buffington did not explain to Plaintiff Benally the disadvantages of applying law other than Navajo law.

On April 18, 2005, a meeting was held with Defendant Rosenfelt, Christine Mumbower, and Defendant Buffington at the Albuquerque office of Rosenfelt & Buffington, P.A. At that time, the firm had obtained agreements from Allstate and GEICO to pay wrongful death proceeds, but it had not obtained agreement from American Family. They discussed proposals for resolving the wrongful death claims and agreed that Defendant Rosenfelt would propose a settlement that corresponded with Arizona law for distribution of wrongful death proceeds. There was no discussion at the meeting regarding Rosenfelt & Buffington, P.A., taking on the representation of other family members.

Defendant Buffington did not have any substantive participation in the case after April 18, 2005.

Rosenfelt & Buffington, P.A., later entered into agreements with wrongful death claimants other than Plaintiffs to represent them in their wrongful death claims.

E-mails exchanged between Defendant Buffington and Ms. Mumbower and Defendant Rosenfelt on March 25, 2005, March 28, 2005, March 30, 2005, April 3, 2005, April 5, 2005, April 6, 2005, April 7, 2005, April 8, 2005, and April 13, 2005, demonstrate that Defendant Buffington was aware of the potential conflicts involved in the firm's representation of Plaintiffs and the other wrongful death claimants.

Defendants maintain that Forrest Buffington did not draft or sign any correspondence to Plaintiffs or to any of Plaintiffs' family members throughout the pendency of the case, and that Defendant Buffington did not participate in or have any knowledge of the communications the firm or any employee of the firm had with Plaintiffs other than the communications that he had

during the meetings of March 7, 2005, and April 12, 2005.

Plaintiffs, however, point to evidence indicating that Defendant Buffington did participate in, review, and approve correspondence to Plaintiffs and their family members. E-mail correspondence between Ms. Mumbower and Defendant Buffington dated March 28, 2005, April 3, 2005, April 5, 2005, and April 6, 2005, shows that Buffington reviewed and approved correspondence to Plaintiff Benally indicating, among other things, that the firm had sent letters soliciting other family members as clients, that "[i]n theory, there would be a conflict of interest if [the] firm represents more than one group of beneficiaries," that the firm would "not be able to settle this claim until all the potential beneficiaries [we]re participating," and that "it [therefore] may make sense to have [the] firm represent [other beneficiaries]." This e-mail correspondence further indicates that Defendant Buffington participated in and had knowledge of the communications of the firm with Plaintiffs other than the communications he had during the March 7, 2005, and April 12, 2005, meetings.

Defendants maintain that Defendant Buffington did not participate in any communications with other wrongful death claimants and that he did not have any knowledge that Rosenfelt & Buffington, P.A., had agreed to represent any claimants other than Plaintiffs Benally and Clark for the wrongful death claims. Plaintiffs point to evidence, however, that when construed in Plaintiffs' favor raises a question of fact with respect to whether Defendant Buffington participated in communications with other wrongful death claimants and whether he participated in the solicitation of those claimants. The e-mail correspondence between Defendant Buffington and Ms. Mumbower and Defendant Rosenfelt, dated April 5, 2005, April 6, 2005, April 7, 2005, and April 8, 2005, shows that Defendant Buffington intended to meet with Plaintiffs and other family members to discuss with them the intended solicitation of other

clients.  Moreover, Defendant Buffington and Ms. Mumbower exchanged e-mails regarding a conflict of interest form that Defendant Buffington was prepared to ask Plaintiffs and the other family members to sign at the April 12, 2005, meeting.  Plaintiffs further point to evidence that Defendant Buffington actually did meet with Plaintiffs and some of the Grandson family members and that he discussed joint representation with them, told them about potential conflicts, and asked them to waive the conflicts without adequately explaining the conflict problems.

Defendant Buffington was the sole attorney from Rosenfelt & Buffington to meet with either of the Plaintiffs.  Defendant Buffington was the only attorney from the firm with whom Plaintiff Benally spoke in connection with the underlying case.  Plaintiffs looked to Defendant Buffington and relied upon Buffington as the attorney for the firm making promises to them.

Defendant Buffington did not inform Plaintiff Benally that he would be left out of the claim.  Defendant Buffington did not inform or explain to Plaintiffs that because other family members were being included in the settlement, Plaintiff Clark would get only a small percentage of the total settlement.  Defendant Buffington did not explain to Plaintiffs that other family members would get more than half of the total settlement.

Plaintiffs, and most family members, were under the impression that Plaintiff Clark, as the surviving son and brother of the decedents, would receive most of the money from the settlement.  This understanding was conveyed to Defendant Buffington.

Although Defendant Buffington discussed with Plaintiffs his representation of other family members, namely Steven Clark and the Grandson family, he did not explain the advantages or disadvantages to them of that representation.

7

**STANDARD**

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation

omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

I.      Jurisdiction.

Defendants move for summary judgment in their favor declaring that the Navajo Nation courts did not have jurisdiction to adjudicate the underinsured motorist claims. "Absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997). Neither GEICO nor American Family are incorporated in the Navajo Nation. The contracts indicate that every act taken to form the underinsured motorist contracts took place outside the boundaries of the Navajo Nation. Neither the Treaty of 1868 between the Navajo Nation and the United States nor any federal statute provides authorization for the Navajo Nation to exercise jurisdiction over the off-reservation conduct of non-members.

"A tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982). The only civil authority retained by tribes to adjudicate claims against nonmembers is limited to nonmember activities within the reservation, and that authority was delineated by the United State Supreme Court in *Montana v. United States*, 450 U.S. 544 (1981), and was further defined

in *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), and *Nevada v. Hicks*, 533 U.S. 353 (2001).  In general, the "inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Montana*, 450 U.S. at 565; *see also Strate*, 520 U.S. at 445-46; *Hicks*, 533 U.S. at 358-59.  "[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes."  *Montana*, 450 U.S. at 564.  *Montana* stated only two exceptions to the general rule that tribes do not have jurisdiction over the activities of nonmembers.  *Id.* at 565-66.  The first exception allows a tribe to regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.  *Id.* at 565.  In *Strate*, the Supreme Court analyzed cases cited by the *Montana* Court to determine the types of activities that fell within the "consensual relations" exception.  520 U.S. at 457.  All of the cases cited involved on-reservation activities of nonmembers.  *Id.*

The second *Montana* exception is that tribes may "exercise civil authority over the conduct of non-members . . . within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Montana*, 450 U.S. at 566.  Therefore, tribes retain the authority to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.  *Id.* at 564.  The Supreme Court has interpreted this exception narrowly.  *Cf. id.* at 457-58 (tribe did not retain the authority to adjudicate claims of a non-Native American driver for injuries arising out of an automobile accident on a state highway that runs through reservation land); *Hicks*, 533 U.S. at 364 (tribal court did not have authority to adjudicate claims against a state officer who engaged in allegedly tortious conduct

10

on tribal land while investigating an alleged off-reservation crime, because that power is not considered necessary to protect trial self government or to control internal relations); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 657 (2001) (tribe did not have authority to impose a tax on nonmember hotel guests staying at a hotel on non-Native American fee lands within the reservation because operation of the hotel had no "direct effect on the political integrity, the economic security, or the health or welfare of the tribe").

The underinsured motorist contracts that are the subject of the underlying case do not fit within the first *Montana* exception. First, the contracts were executed off of the reservation.[3] Second, based upon the Court's analysis of the activities that have fallen within this exception, the Court concludes that a non-member entering into an insurance contract off of the reservation is not the type of activity the Supreme Court had in mind. Likewise, the underinsured motorist contracts, which were entered into outside of the reservation, would not meet the second *Montana* exception. The execution of the underinsured motorist contracts did not occur within the reservation and the Court cannot conclude that the execution threatened or had some direct effect on the political integrity, the economic security, or the health or welfare of the tribe, as that requirement has been analyzed by the *Strate*, *Hicks*, and *Atkinson* Courts.

Moreover, the Court notes that Plaintiffs are not contending, and apparently have never contended, that the Navajo Nation courts have jurisdiction over the underinsured motorist claims. In their response, Plaintiffs plainly state that "[t]here is no such issue in the case," and that they "have made no claim that the defendants should have brought suit against any

---

[3] A contract is considered to be executed or made when the last act necessary for its formation is complete, and where the last act is complete. *Merriman v. Harter*, 59 N.M. 154, 280 P.2d 1045 (N.M. 1955); *Transradio Press Svc, Inc. v. Whitmore*, 47 N.M. 95, 137 P.2d 309 (N.M. 1943).

11

underinsured motorist carrier in Navajo Tribal Court." Resp. to Mot. for Summ. J. to Declare that Navajo Nation Courts did not have Jurisdiction at 4-5. Rather, Plaintiffs only claim that "liability and damages for the collision that killed Lorita Benally, Sylvanna Clark, Sylvannia Clark, and Tom Grandson were exclusively a matter of Navajo law." *Id.* at 5; *see also* Compl. ¶ 29 ("Actions to recover damages for the wrongful deaths of the decedents were recognizable under Navajo law. The courts of the Navajo Nation would have had jurisdiction to handle those claims, determine beneficiaries and distribute the proceeds of any such wrongful death action."). Accordingly, the Court grants Defendants' Motion for Summary Judgment on the discrete question whether the Navajo Nation courts had jurisdiction to adjudicate Plaintiffs' underinsured motorist claims.[4]

II.     <u>Personal Liability</u>.

Defendant Buffington asks the Court to grant summary judgment in his favor declaring that he is not personally liable for the actions that allegedly injured Plaintiffs. The Professional Corporation Act does not modify the legal relationships between a person performing professional services and the client who receives such services. It does, however, limit the liability of shareholders as set forth in the Business Corporation Act and as otherwise provided by law. N.M. Stat. Ann. § 53-6-8. Under the Business Corporation Act, the shareholders, directors, and officers are not personally liable for the acts and obligations of the corporation merely by virtue of the office they hold; they are, however, liable for their own tortious acts.

---

[4] Plaintiffs argue that the Navajo Nation would have jurisdiction to hear the wrongful death claims and to allow the insurers to "interplead the [insruance] funds or pay them into court." Because Defendants' Motion for Summary Judgment is limited to the discrete question whether Navajo Nation courts had jurisdiction to adjudicate Plaintiffs' underinsured motorist claims, Plaintiffs' arguments are not relevant to the Court's analysis, and the Court therefore declines to consider them.

*Stinson v. Berry*, 123 N.M. 482, 486, 943 P.2d 129, 133 (N.M. Ct. App. 1997).  Thus, under the Business Corporation Act, corporate directors and officers are liable for an activity of the corporation only if they directed, controlled, approved, or ratified the activity that led to the injury.  *Id.*

A professional corporation, therefore, will not shield an attorney-shareholder from his or her own misdeeds, but it will provide limited protection for the misdeeds of fellow attorney-shareholders.  *Sanders, Burin, Coll & Worley, P.A. v. McKay Oil Corp.*, 123 N.M. 457, 943 P.2d 104 (N.M. 1997).  A shareholder, director, or officer of a professional corporation is not individually liable for the tortious acts of other shareholders/directors/officers unless he or she personally participated in those tortious acts.  *See id.* at 460-61, 943 P.2d at 107-08 (citing with approval *Grayson v. Jones*, 710 P.2d 76 (Nev. 1985); *Krouner v. Koplovitz*, 175 A.D. 2d 531 (N.Y,. App. Div. 1991)).

Defendant Buffington argues that he did not personally participate in the activities of the corporation that Plaintiffs allege resulted in injury.  In the Complaint, Plaintiffs allege that they were injured by the following actions:  (1) after being retained by Plaintiffs, Defendants solicited other claimants who "had interests contrary to those of Plaintiffs," (2) Defendants did not give Plaintiffs "serious or adequate explanation of the potential conflicts among the parties they were soliciting as clients," (3) Defendants solicited and ultimately represented other claimants without obtaining Plaintiffs' knowing consent to this representation and waiver of the conflicts of interest, (4) Defendants informed Plaintiffs that once the money became available, there should probably be a big meeting including all the potential beneficiaries to discuss the allocation of the settlement money, but never held such a meeting or invited Plaintiffs' input into how the money should be allocated, (5) after signing up the other claimants, Defendants notified Plaintiff

13

Benally that he was no longer needed and stopped notifying him of their actions, including their efforts to distribute all of the wrongful death proceeds to others, (6) Defendants failed to explain to Plaintiffs the "dramatically different results that were likely to happen in the distribution of wrongful death proceeds, depending on whether . . . Navajo law applied" and failed to apply Navajo law, and (7) Defendants distributed too much of the wrongful death proceeds to Steven Clark, not enough to Plaintiff Elliott Clark, and none to Plaintiff Benally.

Defendant Buffington argues that his involvement in the handling of the wrongful death case was limited, and that he did not direct, control, approve, or ratify any of these alleged actions. According to Buffington, his sole involvement was to meet with Plaintiffs and their family members on March 7, 2005, and April 12, 2005, and to participate in the meeting with Defendant Rosenfelt and Ms. Mumbower on April 18, 2005. From April 18, 2005, forward, it is undisputed that Defendant Buffington had no substantive involvement in the case. Defendant Buffington concludes that because he did not personally participate in or have knowledge of the actions alleged by Plaintiffs in the Complaint, and because he did not direct, control, or approve or ratify any of the actions, he cannot be held personally liable for any alleged injuries that were caused by the actions.

Plaintiffs have pointed to evidence, however, that raises a question of fact whether Defendant Buffington personally participated in many of the allegations which Plaintiffs maintain resulted in injury to them. For example, Plaintiffs have pointed to evidence that raises a question of fact whether Defendant Buffington personally participated in soliciting other claimants with adverse interests after he already had been retained to represent Plaintiffs. Specifically, on March 25, 2005, Defendant Rosenfelt sent an e-mail to Defendant Buffington asking, "Who represents Steven Clark?" Buffington responded, "[U]nknown as of now."

14

Rosenfelt replied, "Is he represented at all?  If not, we ought to find them.  If he is, maybe we can make a deal with he lawyer for us to take the lead."  Buffington then indicated, on March 28, 2005, that he was certain the firm could determine Clark's contact information through the firm's client of record.

In addition, between March 30, 2005, and April 5, 2005, Defendant Buffington participated in an e-mail exchange with Ms. Mumbower regarding a draft letter to Plaintiff Benally informing Benally, among other things, that the firm had sent out letters (on March 28, 2005) soliciting other family members as clients.  On March 30, 2005, Ms. Mumbower sent Defendant Buffington an e-mail attaching a draft of the letter to Plaintiff Benally.  Defendant Buffington reviewed the letter, and on April 3, 2005, responded, "Just excellent, as usual."  On March 31, 2005, Ms. Mumbower sent Defendant Buffington another e-mail, with attached draft letter, stating, "Forrest, please disregard my earlier draft of yesterday.  Attached is a new draft with revisions and additions by DMR.  Please let me know ASAP if you have any changes or suggestions, so that we can get this out to Thompson and Elliott on Monday 4/4.  Thanks."  On April 3, 2005, Defendant Buffington responded, "Well, if you read my last, I don't suppose I have any additions."  On April 5, 2005, Mumbower e-mailed Buffington, "Well, here is yet another version of the darned letter, FYI only.  It's finally going out today."  Defendant Buffington replied to this e-mail five minutes later, discussing other aspects of the Plaintiffs' case.  The April 5, 2005, letter to Plaintiff Benally referred to during the e-mail exchange informs Benally of the firm's March 28, 2005, solicitation letters to other family members.  The letter indicates, "We cannot leave these people out of the settlement process because the insurance companies will want to be assured that all potential claimants have been taken care of.  For this reason, we have written to Pauline Grandson, Harry Benally, Sr. and Steven Clark to

15

find out if they have retained an attorney or if they would like our firm to represent them." The letter further indicates,

> Please call to let me know if you consent to our representation of Pauline, so that we can send you a consent form to sign. If we hear from Harry and Steven, and they want our firm to represent them as well, we will again seek your consent. Please understand that, if our firm represents parties with differing interests, the parties would have to agree among themselves how to divide up the settlement money. Our role would be to advise the parties on the applicable law, but we would not take sides.

Defendant Buffington and Ms. Mumbower also exchanged e-mails that indicate that Defendant Buffington was prepared to ask Plaintiffs and other family members to sign a conflict of interest form at the April 12, 2005, meeting. On April 7, 2005, Ms. Mumbower e-mailed Defendant Buffington, indicating that she had been in contact with Henry Benally, Lorita's father. Mumbower informed Buffington that Henry Benally wanted the firm to represent him, and that she would write a letter confirming the representation "once we get Thompson's consent to represent Henry." A few minutes later, Mumbower e-mailed Buffington indicating that "perhaps [Buffington] should have some sort of waiver of conflict form for Thompson to sign allowing [the firm] represent Pauline and Henry. . . . What do you think?" Defendant Buffington responded that same day, "If you have a good waiver form, e-mail it over." Mumbower replied,

> Forrest, I don't have a waiver of conflict of interest form, good or otherwise. If all these people show up next Tuesday (including Pauline and Henry), I think you should just write up something really simple and get them to sign it. Then, if everyone has consented, you should sign up Pauline and Henry as our clients. . . . In the meantime, I will get a letter out to Henry today, thanking him for responding to our letter and letting him know that we would be happy to represent him once we have Thompson's consent.

16

Finally, evidence also indicates that Defendant Buffington spoke with Plaintiffs and other family members at the April 12, 2005, meeting about potential conflicts with other family members and asked them to waive those conflicts.

The facts set forth by Plaintiffs are sufficient to raise a factual question with respect to whether Defendant Buffington personally participated in the solicitation of other claimants with adverse interests after he already had been retained to represent Plaintiffs. The evidence construed in Plaintiffs' favor indicates that Defendant Buffington was involved in communications with Defendant Rosenfelt and Ms. Mumbower regarding the solicitation of other claimants with adverse interests. In addition, Buffington reviewed multiple versions of the April 5, 2005, letter to Plaintiff Benally explaining these solicitations (which occurred prior to informing Plaintiff Benally of the solicitations or obtaining his consent) and the fact that Plaintiff Benally would have to waive the conflicts of interest. Defendant Buffington also was prepared to obtain waivers from Plaintiffs and other family members regarding representation of other claimants at the April 12, 2005, meeting, and did in fact discuss the conflicts of interest with Plaintiffs and other family members at the meeting.

Plaintiffs also have pointed to evidence that raises a question of fact with respect to whether Defendant Buffington personally participated in failing to give Plaintiffs "serious or adequate explanation of the potential conflicts among the parties they were soliciting as clients," and failing to obtain Plaintiffs' knowing consent to solicitation of other claimants and knowing waiver of the conflicts of interest.[5] As described herein, Plaintiffs have pointed to e-mail

---

[5] Defendants do not seek summary judgment as a matter of law regarding the adequacy of the notice of the conflict of interest, and this Memorandum Opinion and Order therefore expresses no opinion on that issue. Rather, Defendants argue solely that the evidence is not sufficient to demonstrate that Defendant Buffington personally participated in the alleged failure to give adequate notice of the conflict of interest.

exchanges indicating that Defendant Buffington reviewed multiple versions of the April 5, 2005, letter to Plaintiff Benally, and that he approved the letter as "[j]ust excellent, as usual." In addition, Plaintiffs have pointed to evidence indicating that Defendant Buffington discussed with the individuals present at the April 12, 2005, meeting the potential conflicts with other family members, and asked them to waive those conflicts. He said that he could not represent everybody without those waivers. Moreover, evidence indicates that although Buffington discussed with Plaintiffs his representation of other family members, he did not explain the advantages or disadvantages of that representation. Plaintiffs produced evidence that he also failed to inform Plaintiffs of the consequences of including other claimants in the settlement and that the expectation of Plaintiffs that Plaintiff Clark would receive most of the money from the settlement would not be realized. Although Defendant Buffington did not have substantive involvement in the case after April 18, 2005, the evidence set forth by Plaintiffs regarding his actions prior to April 18, 2005, is sufficient to raise a factual question with respect to whether he personally participated in the failure adequately to inform Plaintiffs about the potential conflicts of interest.[6]

Furthermore, Plaintiffs have pointed to evidence that raises a question of fact whether Defendant Buffington personally participated in the firm's alleged failure to explain to Plaintiffs the "dramatically different results that were likely to happen in the distribution of wrongful death proceeds, depending on whether . . . Navajo law applied." Plaintiffs have pointed to evidence that raises a factual dispute with respect to whether Defendant Buffington told Plaintiffs and

---

[6] The fact that no evidence indicates that Defendant Buffington personally participated in the firm's ultimate act of obtaining signed waivers of the conflicts of interest does not persuade the Court otherwise. Such evidence is not necessary to raise a factual question with respect to whether Defendant Buffington himself personally participated in any alleged failure to give Plaintiffs adequate explanation of the potential conflicts.

their family members during the March 7, 2005, and/or April 12, 2005, meetings that Navajo law would be applied. Plaintiffs have also pointed to evidence indicating that Defendant Buffington did not explain to Plaintiff Benally the disadvantages of applying law other than Navajo law. This evidence is sufficient to raise a factual question with respect to whether Defendant Buffington personally participated in the firm's alleged failure to explain to Plaintiffs the significance of Navajo law.[7]

Plaintiffs have pointed to evidence that raises a material factual dispute with respect to whether Defendant Buffington personally participated in the wrongful actions alleged in the Complaint. Accordingly, the Court denies Defendants' motion for summary judgment seeking a declaration that Defendant Buffington is not personally liable for Plaintiffs' injuries.

## CONCLUSION

**IT THEREFORE IS ORDERED** that Defendants' Motion for Summary Judgment to Declare that Navajo Nation Courts did not have Jurisdiction to Adjudicate Plaintiffs' Underinsured Motorist Claims, filed February 7, 2007 [Doc. 34], is hereby **GRANTED**;

**IT FURTHER IS ORDERED** that Defendants' Motion for Summary Judgment to Declare that Forrest Buffington is not Personally Liable for the Actions that Allegedly Injured Plaintiffs in the Underlying Suit, filed February 28, 2007 [Doc. 39], is **DENIED**.

---

[7] Plaintiffs also argue that Defendant Buffington was personally involved in other wrongful acts, including breaking an alleged promise to have a meeting with all the family members to discuss allocation of the proceeds, and breaking an alleged promise that the firm "would not take sides" in representing the parties. Plaintiffs also argue that Defendant Buffington has not met his initial summary judgment burden of demonstrating that he is entitled to judgment as a matter of law on the facts set forth by Defendants. Because the Court already has concluded that Plaintiffs have raised a question of fact regarding Defendant Buffington's personal participation in the allegations giving rise to Plaintiffs' injuries, and that the motion for summary judgment should be denied on this ground, the Court declines to consider these other arguments.

Dated this 24th day of September 2007.

```
                                    _____
                                    JUDITH C. HERRERA
                                    UNITED STATES DISTRICT JUDGE
```